# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KATY INDUSTRIES, INC., *et al.*,[1] | Case No. 17-11101 (KJC) |
| Debtors. | (Jointly Administered) |
| The Official Committee of Unsecured Creditors of Katy Industries, Inc., *et al.*, | |
| Plaintiff, | Adv. No. 17-50937 (KJC) |
| v. | |
| Victory Park Capital Advisors, LLC; Victory Park Management, LLC; VPC SBIC I, L.P.; Jansan Acquisition, LLC; and Charles Asfour, | Related Adv. D.I. No. 1, 14 |
| Defendants. | |

## OPINION[2]

### BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

If a portion of a credit bid ($7.5 million) is subtracted from a buyer's $45.7 million successful bid for the Debtors' assets when there are no other bidders, does it make a difference? The answer lies in an analysis of whether Counts I–V of the Official Committee of Unsecured

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Katy Industries, Inc. (7589), Continental Commercial Products, LLC (3898), FTW Holdings, Inc. (7467), Fort Wayne Plastics, Inc. (7470), Wabash Holding Corp. (9908), Katy Teweh, Inc. (9839), WII, Inc. (0456), TTI Holdings, Inc. (8680), GCW, Inc. (5610), Hermann Lowenstein, Inc. (4331), American Gage & Machine Company (7074), WP Liquidating Corp. (2310), Ashford Holding Corp. (8113), and HPMI, Inc. (4677). The corporate headquarters and the mailing address for the Debtors listed above is 11840 Westline Industrial Drive, Suite 200, St. Louis, MO 63146.

[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. These matters are "core" pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (B), (D), (H), (K), (M), and (O).

Creditors' (the "Committee") adversary complaint (the "Complaint")[3] against the successful bidder and others, for recharacterization or subordination, avoidance, and recovery, respectively, can survive the Defendants' motion to dismiss (the "Motion to Dismiss").[4] For the reasons set forth below, they cannot. Therefore, the Motion to Dismiss as to Counts I–V will be granted, with prejudice. The Motion to Dismiss as to Count VI, alleging a breach of the fiduciary duty of loyalty, will also be granted with prejudice.

## BACKGROUND

Founded more than 50 years ago, Katy Industries, Inc. manufactured, imported, and distributed commercial cleaning and consumer storage products, distributing products across the United States and Canada. In 2015, Victory Park[5] provided secured acquisition financing (the "Second Lien Agreement") to Katy Industries, Inc. and its affiliates ("Katy" or the "Debtors"). The Debtors' obligations under the Second Lien Agreement were secured by second liens on substantially all of their assets, junior only to existing liens under a secured credit facility with BMO Harris Bank N.A. ("BMO"). Falling victim to a liquidity crisis, in mid-2016, Katy defaulted on both its Second Lien Agreement obligations and its obligations to BMO. Consequently, the Debtors, Victory Park, and BMO entered into a multi-step transaction (the "2016 Restructuring"), whereby: Victory Park would advance an additional $6.5 million, to be funded directly to BMO; the parties would amend the Second Lien Agreement; Victory Park would purchase all of Katy's outstanding preferred stock; Victory Park would replace a majority of Katy's board of directors; BMO would enter into a six month forbearance agreement; and the Debtors would retain a Chief

---

[3] Adv. D.I. 1 [hereinafter, the "Complaint"]. Docket items in this adversary action are referred to herein as "Adv. D.I. #" and docket items from the main case are referred to herein as "Bankr. D.I. #".
[4] Adv. D.I. 14.
[5] Victory Park is comprised of Victory Park Capital Advisors, LLC, Victory Park Management, LLC, and VPC SBIC I, LP.

Restructuring Officer (CRO) (collectively embodied in the "VP Term Sheet"). As an express condition of the 2016 Restructuring, all other of the Debtors' creditors were subordinated to Victory Park, excluding trade creditors in the ordinary course of business.

The parties executed the VP Term Sheet on July 22, 2016, and on that same day, Victory Park and the Debtors executed a third amendment to the Second Lien Agreement (the "Third Amendment"). Under the Third Amendment: Victory Park advanced an additional $750,000 to Katy (the "July 2016 Advance"); the Second Lien Agreement's amortization schedule was amended; and the repayment and interest terms of the Second Lien Agreement were amended.

On August 11, 2016, Victory Park and the Debtors consummated the 2016 Restructuring, entering into the fourth amendment to the Second Lien Agreement (the "Fourth Amendment"). Under the Fourth Amendment, among other things, Victory Park advanced an additional $5.75 million to Katy (the "August 2016 Advance") and the parties entered into a stock purchase agreement, in which Victory Park purchased all of a Katy affiliated holding company's convertible preferred stock (the "Stock Purchase Agreement"). As part of the Stock Purchase Agreement, all of Katy's directors, other than its Chief Executive Officer (CEO), resigned, and the CEO appointed Charles Asfour[6] as one of the replacements. On August 30, 2016, Asfour was named Chairman of Katy's Board of Directors.

On November 16, 2016, the Debtors refinanced their BMO credit facility and simultaneously entered into a fifth amendment to the Second Lien Agreement (the "Fifth Amendment"), but, again, faced immediate liquidity issues.

---

[6] Charles Asfour, at the time Complaint was filed, was a partner at Victory Park Capital Advisors, LLC.

In February of 2017, Katy's Board of Directors delegated its authority to a special committee.[7] According to the Complaint, despite the composition of the special committee:

> Victory Park maintained *de facto* control over the Debtors by virtue of, among other things, (i) its position as an incumbent secured creditor with blanket liens in the Debtors' assets, including bank accounts; (ii) its history and close working relationship with the Debtors' CRO and management team; and (iii) the understanding and expectation among the Debtors' management that Victory Park would acquire the Debtors' businesses.[8]

The following month, the Debtors retained Lincoln International, Inc. ("Lincoln") as their investment banker to initiate a marketing and sale process.

On April 3, 2017, Victory Park and the Debtors executed the sixth amendment to the Second Lien Agreement (the "Sixth Amendment"). Under the Sixth Amendment, Victory Park advanced an additional $1 million to the Debtors (the "April 2017 Advance"), which, like the July 2016 Advance and the August 2016 Advance, was payable in a single balloon payment of principal and accrued PIK interest at maturity. Collectively, these three advances (the "Advances") are central to the issues raised by the Complaint.

On April 13, 2017, Highview Capital, LLC ("Highview") contacted Lincoln to obtain a marketing "teaser" and enter into a non-disclosure agreement (NDA), which was not executed until April 21, 2017, for purposes of accessing Lincoln's sale dataroom.[9] The Complaint alleges that in the meantime, Asfour was consistently feeding Highview sensitive financial and operational information, in an effort to induce Highview to enter into a joint venture with Victory Park to

---

[7] Complaint, at ¶ 29. The special committee was comprised of Thomas Allison and John Wallis, two of the three Katy Directors; Asfour was not a member of the special committee. *Id.* The Complaint does not specify the purpose for which the Special Committee was formed or the scope of its charter.
[8] *Id.*
[9] The question of who initiated the relationship with whom is a disputed fact, which is viewed in the light most favorable to the Committee, the non-moving party.

purchase the Debtors' assets.[10] On April 20, 2017, Victory Park and Highview discussed forming a joint venture, whereby: (i) the joint venture vehicle ("Jansan") would be formed to purchase the Debtors' assets and provide DIP financing for a chapter 11 bankruptcy process; (ii) Highview would provide a $6.5 million DIP loan to the Debtors in exchange for equity in Jansan with a first priority distribution preference; (iii) Victory Park would contribute approximately $38.046 million in second-lien debt in exchange for equity in Jansan with a second-priority distribution preference; and (iv) Highview and Victory Park would share further distributions proportionately.[11]

Near the end of April, Jansan sent a letter of intent to the Debtors, detailing its bundled purchase offer and DIP financing proposal.[12] The Complaint alleges that, although Lincoln had yet to complete its marketing materials, it was forced to pivot and search for another party interested in bundling a purchase offer and DIP financing proposal or advise the Debtors to accept Jansan's proposal.[13] On April 30, 2017, Asfour sent an email to Highview, "assuring them that, while 'Lincoln has been out shopping the DIP opportunity,' he was 'not too fussed about it… as we would never let anyone else in front of us so there is no practical way for someone else to compete with what we are doing.' He characterized the effort to market the DIP as mere 'board CYA' and 'noise.'"[14]

Lincoln was unable to find an alternative bundled purchaser and consequently, on May 14, 2017, the Debtors filed their chapter 11 petitions (the "Petition Date"), with Jansan's bundled stalking horse bid and DIP financing package. Later that day, the Debtors filed their DIP Financing

---

[10] Complaint, at ¶ 35. For example, the Complaint alleges that on April 18, 2017, "Asfour emailed a Highview principal, requesting a call 'about the Katy deal' to advise of 'some developments,' including that 'the transaction is taking a turn that will ultimately benefit us but the timeline is going to be accelerated.'" Adv. D.I. 1, at ¶ 36.
[11] Complaint, at ¶ 39.
[12] *Id.* at ¶ 40.
[13] *Id.*
[14] *Id.* at ¶ 41.

Motion[15] and their Sale Motion.[16] Two days later, the Court entered an interim order approving the DIP Financing Motion.[17] The United States Trustee appointed the Committee on May 26, 2017. On June 12, 2017, the Committee filed an objection to the Sale Motion and DIP Financing Motion.[18] On June 19, 2017, the Court entered the Final DIP Order.[19] The Final DIP Order reflected certain changes to resolve the Committee's objection. Specifically, paragraph 26 of the Final DIP Order (Stipulations Regarding Prepetition Obligations and the Prepetition Liens Binding) states:

> The stipulations and admissions contained in this Final Order... shall be binding on the Debtors' estates and any successor thereto... and all parties in interest, including, without limitation, any Committee, unless a party has timely commenced a contested matter or adversary proceeding (a "Challenge") (a) challenging the amount, validity or enforceability of the Prepetition Second Lien Obligations, (b) challenging the perfection or priority of the Prepetition Second Liens, (c) challenging the existence of any DIP Collateral, or (d) otherwise asserting any objections, claims or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) against the Prepetition Second Lien Lenders relating to the Prepetition Second Liens or the Prepetition Second Lien Obligations....[20]

---

[15] Bankr. D.I. 14. The full title of the DIP Financing Motion is: Motion for Entry of Interim and Final Order (I) Authorizing the Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.

[16] Bankr. D.I. 18. The full title of the Sale Motion is: Motion for Entry of Order (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets; (B) Approving Stalking Horse Protections; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Approving the Form and Manner of Notice Thereof; (II)(A) Approving and Authorizing Sale of Substantially All of the Debtors' Assets to the Successful Bidder Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief.

[17] See Bankr. D.I. 48.

[18] See Bankr. D.I. 119.

[19] Bankr. D.I. 167. The full title of the Final DIP Order is: Final Order Pursuant to Sections 105, 361, 362, 363, 365, and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Granting Adequate Protection to the Prepetition Second Lien Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granted Related Relief.

[20] Bankr. D.I. 167, at ¶ 26.

Subsequently, the Court entered the Bidding Procedures Order, which approved Jansan as the stalking-horse bidder.[21] The Bidding Procedures Order also reflected similar changes made to accommodate and resolve the Committee's objection. On June 21, 2017, the Debtors filed their amended asset purchase agreement with Jansan,[22] and on July 5, 2017, the Debtors filed a proposed sale order,[23] to which the Committee filed its Objection and Reservation of Rights with Respect to Form of Sale Order.[24]

On July 12, 2017, the Debtors filed their Notice of Successful Bidder and Cancellation of Auction,[25] which indicated that Jansan's bid was the only qualified bid received by the deadline; accordingly, the Debtors did not conduct an auction. The Court entered the Sale Order on July 18, 2017,[26] approving the final form of the Debtors' amended and restated asset purchase agreement with Jansan (the "Final APA" or the "Jansan Transaction").[27] Paragraph 48 of the Sale Order states:

> Notwithstanding anything to the contrary contained in this Order or in the Final APA, entry of this Order and approval and consummation of the transactions contemplated hereby shall not limit or otherwise affect the rights or remedies of the Debtors' estates or the Committee with respect to any 'Challenge' as described in paragraph 26 of the Final DIP Order.[28]

Under Section 3.1 of the Final APA, the approximately $63 million aggregate purchase price for the Purchased Assets (the "Purchase Price") was calculated as:

---

[21] Bankr. D.I. 163. The full title of the Bidding Procedures Order is: Order (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Approving the Form and Manner of Notices Thereof.
[22] See Bankr. D.I. 180.
[23] See Bankr. D.I. 218.
[24] See Bankr. D.I. 268.
[25] See Bankr. D.I. 276.
[26] See Bankr. D.I. 295. The full title of the Sale Order is Order (A) Approving and Authorizing Sale of Substantially All of Debtors' Assets Pursuant to Purchaser's Asset Purchase Agreement Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief.
[27] See Bankr. D.I. 295, Exhibit A.
[28] Bankr. D.I. 295, at ¶ 48.

[A]n amount equal to (i) the assumption of the Encina Obligations, which amount shall be reduced by any prepayments; *plus* (ii) a credit bid in the amount outstanding under the $7.5 million secured debtor-in-possession credit facility at the time of the Closing; *plus* (iii) a credit bid in the amount of the Second Lien Debt; *plus* (iv) the Assumed Liabilities; *plus*....[29]

According to the Complaint, through a credit bid, Jansan offset $36.7 million of claims under the Second Lien Agreement against the Purchase Price for the assets.[30]

On July 25, 2017, the Committee filed the Complaint against Victory Park, Jansan, and Asfour.[31] The Complaint contains six counts in total.[32] Counts I and II allege that the Advances should be recharacterized as equity investments, or in the alternative, subordinated. Statutorily, Counts I and II are premised on a claim objection pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1), and equitable subordination pursuant to 11 U.S.C. § 510(c). Count III is for avoidance of the Advances pursuant to 11 U.S.C. § 544(a) and the Uniform Fraudulent Transfer Act (UFTA). Count IV is also for avoidance of the Advances, but pursuant to 11 U.S.C. § 549(a). Count V is for recovery of the avoided transfers pursuant to 11 U.S.C. § 550(a), which is contingent upon the previous counts. Finally, Count VI alleges that Asfour breached his fiduciary duty of loyalty owed to Katy and the Debtors.

On September 12, 2017, the Defendants filed the Motion to Dismiss,[33] which was followed by the Committee's Brief in Opposition on September 26, 2017,[34] and the Defendants' Reply

---

[29] Bankr. D.I. 295, Exhibit A, at § 3.1.
[30] Complaint, at ¶ 57.
[31] After motion practice and a hearing on August 24, 2017, this Court granted the Committee exclusive derivative standing and authority to prosecute Counts III-VI. *See* Bankr. D.I. 398.
[32] The Complaint originally contained a seventh count against Victory Park for aiding and abetting Asfour's alleged breach of the fiduciary duty of loyalty. However, on September 8, 2017, the parties stipulated to its dismissal without prejudice.
[33] Adv. D.I. 14, 15.
[34] Adv. D.I. 21.

Memorandum on October 6, 2017.[35] The Court held Oral Argument and subsequently took the matter under advisement.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[36] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."[37] The Court of Appeals for the Third Circuit has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." [38]

When deciding a motion to dismiss, a court may generally not consider matters extraneous to the pleadings. However, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."[39] Additionally, a court may take judicial notice of adjudicative facts as contemplated by Federal

---

[35] Adv. D.I. 23.
[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[37] *Twombly*, 550 U.S. at 555 (citations omitted).
[38] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).
[39] *Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)); *see also In re Tropicana Entm't, LLC*, 520 B.R. 455, 467 (Bankr. D. Del. 2014).

Rule of Evidence 201.[40] The movant carries the burden of demonstrating that dismissal is appropriate. Ultimately, evaluation of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[41]

## DISCUSSION

I. Counts I and II – Recharacterization or, in the Alternative, Subordination of the Advances

Counts I and II seek to recharacterize the Advances as equity or, in the alternative, subordinate the Advances, effectively eliminating Jansan's ability to credit bid $7.5 million of the Purchase Price. The Sale Order contains language preserving the "rights or remedies of the Debtors' estates or the Committee with respect to any 'Challenge' as described in paragraph 26 of the Final DIP Order" (the "Savings Clause").[42] The gating issue before the Court is whether the Committee successfully preserved its ability to assert its claims for recharacterization or subordination of the Advances in the first place.

The Committee points to *Epic Metals Corp. v. H.H. Robertson Co.*[43] in support of its assertion that its Challenge rights were preserved. Agreeing in principle with the lower court, the Court in *Epic Metals* explained, "A party may expressly reserve in a consent judgment the right to relitigate some or all issues that would have otherwise been barred between the same parties."[44] However, as noted by the Defendants, "Any such reservation must be discerned within the four corners of the consent decree, and cannot be expanded beyond the decree's express terms."[45]

---

[40] *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988).
[41] *Iqbal*, 556 U.S. at 678.
[42] Bankr. D.I. 295, at ¶ 48.
[43] 870 F.2d 1574 (Fed. Cir. 1989).
[44] *Id.* at 1576 (citing *United States v. Athlone Indus., Inc.* 746 F.3d 977, 983 n.5 (3d Cir. 1984)).
[45] *Id.* at 1577 (citing *United States v. Armour & Co.*, 402 U.S. 673, 681–83 (1971)).

Applying this analysis to the case at hand,[46] the Committee's present claims for recharacterization or subordination of the Advances must be discernible within the four corners of the Sale Order; the Defendants assert that they are not.

The Savings Clause uses the defined term "Challenge," cross-referencing the Final DIP Order. As illustrated above, the Final DIP Order explains that a Challenge may: (a) challenge the amount, validity or enforceability of the Prepetition Second Lien Obligations, (b) challenge the perfection or priority of the Prepetition Second Liens, (c) challenge the existence of any DIP Collateral, or (d) otherwise assert any objections, claims or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) against the Prepetition Second Lien Lenders relating to the Prepetition Second Liens or the Prepetition Second Lien Obligations.[47] While parts (a) through (c) of the definition are narrowly tailored to encompass lien and collateral package challenges, part (d) is drafted more broadly.

Into which category do the Committee's claims for recharacterization or subordination fall? Should they be considered lien challenges as the Committee suggests? Or, should they be considered claim objections, as asserted by the Defendants? No matter. Even assuming, but not deciding, that the Committee's right to bring these Challenges after the consummation of the Sale Order was preserved, there is no practical, useful remedy that results in any recovery to the estate.[48]

---

[46] The Court notes that the Savings Clause within the Sale Order is unusual, in that such reservations of rights are not regularly included in such documents.
[47] Bankr. D.I. 167, at ¶ 26.
[48] While not discussed by the parties, the Committee's claims for recharacterization or subordination may be moot under the theory of prudential mootness. *See Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 862 n.1 (3d Cir. 2012) (quoting *Int'l Bhd. Of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)) ("The key inquiry in a prudential mootness analysis is 'whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.'"); *see also In re Box Bros. Holding Co.*, 194 B.R. 32, 45 (D. Del. 1996) ("This result occurs when the occurrence of facts and events in the commercial world cause a court to be unable to grant meaningful relief. The matter is moot out of necessity, not application of equitable principles. In a very real sense the doctrine is more accurately denominated 'prudential mootness.'").

Neither recharacterizing nor subordinating the Advances would enhance any potential distribution to creditors.

Jansan's bid was the only qualified bid received by the deadline, with a Purchase Price of approximately $63 million.[49] Under the APA, Jansan credit bid and offset approximately $36.7 million of the Purchase Price; the assumed liabilities make up the remaining $26.3 million balance.[50] As the Defendants specifically argued throughout their papers and during Oral Argument, even if $7.5 of Jansan's credit bid is disqualified (the amount of the Advances), Jansan would have simply gone to market with $29.2 million in § 363(k) currency and $55.5 million collectively as its bid. Given the lack of alternative qualified bidders, $55.5 million would still have been the successful bid. Accordingly, reshaping the economics of the deal to reflect a hypothetical reduction of $7.5 million in § 363(k) currency would have no tangible, ameliorative effect for the Committee.[51]

---

[49] Bankr. D.I. 276, Adv. D.I. 1, at ¶ 53.
[50] Complaint, at ¶ 57. 11 U.S.C. § 363(k) expressly allows for secured, allowed claim holders to offset, or credit bid, such claims against the purchase price of targeted property. The claims at issue here were allowed pursuant to the Sale Order and the Bidding Procedures Order.
[51] At Oral Argument, the parties disputed the theoretical definition of "remedy" under these circumstances. The Committee argued that the Purchase Price was a dollar amount, which, if the Committee's claims were successful, would require Jansan to pay back $7.5 million to the estate. The Defendants countered that the Purchase Price was simply a number calculated to set the overbid for purposes of the bidding process; accordingly, reducing Jansan's credit bid by $7.5 million would only lower the overbid. In addition, the Committee's request for relief calls for what would amount to a partial invalidation of both the Bidding Procedures Order and the Sale Order. To do so would turn on its head the finality necessary for the legitimacy of the Section 363 sale process.

The above calculation is reflected in the follow chart:

| | |
|---|---|
| Total Credit Bid | $36,700,000 |
| + Assumed Liabilities | $26,300,000 |
| = Original Total Purchase Price | $63,000,000 |
| | |
| Total Credit Bid | $36,700,000 |
| − Advances | $7,500,000 |
| = Remaining Credit Bid | $29,200,000 |
| + Assumed Liabilities | $26,300,000 |
| = New Total Purchase Price | $55,500,000 |

Pushing back at this conclusion, the Committee also speculates that Jansan's high bid may have had a chilling effect on other potential bidders; a $7.5 million decrease in the set overbid price may have spurred interest. Nothing in the Complaint (or adduced at the Bidding Procedures Hearing or Sale Hearing), finds any support for that theory.

Counts III, IV, and V fail independently. Count III asserts a claim for avoidance based upon 11 U.S.C. § 544. However, § 544 applies only to prepetition transfers of property, whereas the disputed transfer of property in question here, the credit bid of the Advances, occurred postpetition pursuant to the Sale Order.[52] Count IV asserts a claim for avoidance based upon 11 U.S.C. § 549. However, § 549 is applicable only to postpetition transfers that have not been authorized by the court. The Sale Order specifically authorized the credit bidding of the Advances,

---

[52] *See, e.g., Old West Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856, 864 (11th Cir. 2010) ("The trustee can only use the section 544(a) avoidance power to avoid pre-petition transfers."); 5 COLLIER ON BANKRUPTCY ¶ 544.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("The section 544(a) powers... are limited by their terms and may not be used by the trustee to avoid postpetition transfers.").

the property transfers in question. Finally, Count V is a contingent claim for recovery upon the success of Count III or IV. Therefore, Count V necessarily fails as well.

Even if certain of the Committee's rights were preserved in the Savings Clause, and based upon an analysis of the economics behind the Jansan Transaction, absent upsetting the entirety of the Jansan Transaction and the Sale Order, this Court cannot appropriately fashion a remedy. Therefore, the Committee necessarily has not stated a claim upon which relief may be granted and the Motion to Dismiss with regard to Counts I, II, III, IV, and V is granted with prejudice.

II. <u>Count VI – Breach of the Duty of Loyalty</u>

Count VI of the Complaint alleges that Asfour breached his fiduciary duty of loyalty by:

> (i) pursuing a joint venture opportunity with Highview, a potential bidder for the Debtors' assets, on behalf of Victory Park which precluded the possibility of receiving a stand-alone bid from Highview for the Debtors' assets; (ii) using sensitive financial and operation information about the Debtors, obtained in his capacity as a director, for personal gain in his dealings with Highview, and sharing such material non-public information of the Debtors with Highview... without authorization from the Debtors and without an appropriate NDA in place; (iii) tasking the Debtors' management with responding to informational requests from Highview for personal gain, without disclosing the origin or purpose of those requests; and (iv) failing to disclose to the Debtors Victory Park's intention to oppose any alternative to Jansan's DIP proposal, causing the Debtors to incur needless expense and delay shopping the DIP, and needless delay in finalizing and disseminating marketing materials to the universe of potential bidders.[53]

Under Delaware law, the fiduciary duty of loyalty prohibits directors from taking action that would cause harm, unfairness, or detriment to the corporation.[54] Directors "are not permitted to use their

---

[53] Complaint, at ¶ 84. The Complaint goes on to state, "Asfour's breaches of his fiduciary duty of loyalty (i) substantial harm to, and were unfair to, the Debtors, and (ii) resulted in personal gains for Asfour. *Id.* at ¶ 85. The parties agree that Delaware law governs this issue.
[54] *See Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *see also In re Walt Disney Co. Deriv. Litig.*, 2004 WL 2050138, at *5 n.49 (Del. Ch. Sept. 10, 2004) (quoting *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) (explaining that the duty of loyalty requires a director to "refrain from any conduct that would harm the corporation.")); *Joyce, on Behalf of CTC Minerals, Inc. v. Cuccia*, No. CA 1495, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997) ("To state a legally sufficient claim for breach of the duty of

position of trust and confidence to further their private interests." Generally, to survive a motion to dismiss, a plaintiff must sufficiently allege duty, breach, causation, and damages. However, Delaware has taken particular interest in the pleading standard for the latter two elements for alleged breaches of the duty of loyalty, so I will first examine whether Delaware law requires the Complaint to allege harm to the Debtors.

    a. Alleging Harm to the Corporation

In its Motion to Dismiss, the Defendants argue fervently that, because the Complaint does not, other than with brief, conclusory statements,[55] allege that Asfour's conduct caused any harm to the corporation, Count VI of the Complaint cannot survive. In response, the Committee points to Delaware's distaste for disloyalty and application of loosened pleading requirements.

In *Guth v. Loft*[56], the Delaware Supreme Court considered one of the bedrock cases for the corporate opportunity doctrine and the overarching duty of loyalty, explained:

> The [duty of loyalty], inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

Seizing upon this language, the Committee argues that its Complaint does not need to allege that Asfour's conduct resulted in specific harm to the Debtors. The Committee also relies heavily on *Thorpe by Castleman v. CERBCO, Inc.*[57] In *CERBCO*, the Delaware Supreme Court examined the lower court's finding that while individual directors (the Eriksons) breached their duties of loyalty,

---

loyalty... [a plaintiff] must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair.").
[55] *See, e.g.*, Complaint, at ¶ 85.
[56] 5 A.2d 503 (Del. 1939).
[57] 676 A.2d 436 (Del. 1996); *but see, e.g.*, Val Ricks, *No Power to be Disloyal (or, How Not to Write a Loyalty Opinion)*, 6 J. BUS. ENTREPRENEURSHIP & L. 247 (Spring 2013) (criticizing the analysis in *CERBCO*).

they were not liable because the corporation had not been harmed and the Eriksons had not profited substantially.[58] The Delaware Supreme Court disagreed, explaining that the Eriksons profited from their dealings with a third party and the corporation incurred expenses in connection with unnecessary negotiations.[59]

In *CERBCO*, the Court explained, "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[60] Additionally, the Court cited the Second Circuit's decision in *Millbank*: "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages."[61] Quoting back to its decision in *In re Tri-Star Pictures, Inc., Litig.*, the *CERBCO* Court further noted:

> [T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity.[62]

According to *CERBCO*, once disloyalty has been established, courts may liberally impose liability upon the disloyal party, including incidental damages when no transactional damages are present, in order to ensure that a fiduciary not personally profit, or the beneficiary be harmed, by her conduct.[63]

---

[58] 676 A.2d at 445.
[59] *Id.*
[60] *Id.*
[61] *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994).
[62] 634 A.2d 319, 334 (Del. 1993) (quoting *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991)).
[63] *CERBCO*, 676 A.2d at 445 (imposing liability on the Eriksons of the amount received from a third party's letter of intent, as well as any expenses the corporation incurred to accommodate the Erikson's pursuit of their own interests over the corporation's interests).

In response to the Committee's heavy reliance on *CERBCO*, the Defendants highlight that the *CERBCO* defendants' liability for breach of the duty of loyalty had already been established at the lower court, and further argue that the Delaware Supreme Court's decision only illustrated that "damages are available even when there is no actual monetary injury to a corporation."[64]

Even assuming loosened requirements for pleading causation and damages for a breach of the duty of loyalty, entitlement to relief requires more than mere labels and conclusions; a formulaic recitation of the elements of a cause of action will not suffice.[65] The Complaint does little more than provide blanket statements that Asfour benefitted personally from his conduct and that the Debtors were substantially harmed. So, even under relaxed pleading standards, the Complaint cannot survive the Motion to Dismiss.

Even assuming arguendo, however, that the "allegations of harm" to the Debtors could pass the pleading standards under Delaware law, the allegations in Count VI fail for separate and independent reasons. The Complaint necessarily fails to allege that Asfour violated the corporate opportunity doctrine.

b. Corporate Opportunity Doctrine

Under the corporate opportunity doctrine, a corporate officer or director may not take a business opportunity for her own if:

> (1) The corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[66]

---

[64] Adv. D.I. 23, at 12.
[65] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
[66] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). On the other hand, a corporate officer or director may take the business opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the

The Committee has failed to plead sufficiently a violation of the corporate opportunity doctrine for two reasons. First, the Committee has not plead any facts to support the theory that Highview, or anyone else for that matter, was interested in pursuing a standalone bid. In fact, the Complaint is entirely devoid of any information regarding a possible standalone bid or interest by another bidder. The critical issue here is whether the corporation has an interest or expectancy in the opportunity.[67] Other than the conclusory statement that Asfour's actions "precluded the possibility of receiving a stand-alone bid from Highview for the Debtors' assets," nothing supports a finding that the Committee has sufficiently plead an "interest or expectancy in the opportunity." Accordingly, as the test for violation of the corporate opportunity doctrine is conjunctive, the failure to satisfy one prong constitutes a death knell for that allegation.

Second, the Defendants argue that, at the Sale Hearing, there was "unchallenged testimony from Katy's Chief Restructuring Officer, Peter Jenkins, which made clear that 'Highview Capital was not interested in lending money to debtors or purchasing debtors' assets without partnering with Victory Park. It was never a standalone bid.'"[68] The Committee counters that, under Federal Rule of Evidence 201, the Court may not take judicial notice of this testimony because it is "subject to reasonable dispute."[69] The Court need not engage in this analysis, however. Without making a determination of whether the testimony is actually subject to reasonable dispute, the Court simply may take judicial notice of the fact that the CRO's proffered testimony was not rebutted or objected to at the hearing.

---

corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity. *Id.* (citing *Guth*, 5 A.2d at 509).
[67] *See Broz*, 673 A.2d at 155.
[68] Adv. D.I. 15, at 11 (quoting July 17, 2017 Hr'g Tr. at 24:7–9).
[69] The Committee argues, "Lobbing a proffer of a witness onto the record at an uncontested hearing does not render the proffered testimony (which is hearsay) 'not subject to reasonable dispute' so as to the fall within the ambit of Rule 201." Adv. D.I. 21, at 25 n.7.

Based on the lack of facts to support a plausible allegation that the Debtors had a true interest or expectancy in receiving a standalone bid from Highview or another bidder, coupled with the Court's reasonable inference from the Committee's failure to rebut the CRO's proffered testimony at the Sale Hearing, the Committee's allegation that Asfour violated the Corporate Opportunity Doctrine cannot survive the Defendants' Motion to Dismiss.

c. Failure to Disclose

The Committee's final allegation is that Asfour breached his duty of loyalty by "failing to disclose to the Debtors Victory Park's intention to oppose any alternative to the Jansan DIP Proposal, causing the Debtors to incur needless expense and delay shopping the DIP, and needless delay in finalizing and disseminating marketing materials to the universe of potential bidders."[70] Section 364 of the Bankruptcy Code,[71] however, requires that a trustee, or, in this case, a debtor-in-possession seek alternative DIP proposals in an effort to secure the most favorable terms. Accordingly, in the commonplace scenario that a prospective DIP lender makes it known that it will oppose any alternative proposals, a debtor is not relieved of its duty to shop or market the DIP.

---

[70] Complaint, at ¶ 84.
[71] 11 U.S.C. § 364 states:
  (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
    (3) secured by a junior lien on property of the estate that is subject to a lien.
  (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
    (A) the trustee is unable to obtain such credit otherwise; and
    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
    (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Other than by conclusory statements, the Complaint does not allege that the Debtors' DIP process was any more expensive or protracted than it would have been if Asfour had disclosed Victory Park's intention to oppose an alternative proposal. There is no plausible claim that the sale process here was in any way impaired. Failing to allege sufficiently a breach of the duty of loyalty, the allegation for failure to disclose cannot survive the Defendants' Motion to Dismiss.

Accordingly, while the Court finds that Count VI of the Complaint fails by nature of not alleging sufficiently a personal benefit to Asfour or harm to the Debtors, in the alternative, Count VI also fails to allege sufficiently a violation of the corporate opportunity doctrine or a failure to disclose.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is granted, in its entirety, with prejudice. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: July 6, 2018